**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| JAMES T. BANKOWSKI, | : | CIVIL ACTION NO. 11-3516 (MLC) |
| | : | |
| Petitioner, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| EVELYN DAVIS, et. al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

**COOPER, District Judge**

Petitioner, James T. Bankowski, challenges his 2008 New Jersey state court

conviction in this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254

("Section 2254").  For the following reasons, the petition will be denied for lack of merit.

**I.     BACKGROUND**

**A.     Procedural History**

A Grand Jury returned Indictment No. 07-03-0671 on March 14, 2007, charging

Petitioner with: third degree resisting arrest (Count I); fourth degree obstruction of justice

(Count II); third degree aggravated assault (Count III); and third degree witness tampering

(Count IV).  On November 14, 2007, a Grand Jury returned Indictment No. 07-11-2606,

charging Petitioner with: second degree witness tampering (Count I); third degree

aggravated assault (Count II); and fourth degree weapons possession (Count III).  (ECF

No. 8-11, Def. Br. on Direct Appeal at 1 & Da1-6.)  In a pretrial motion heard on October

15, 2008, the Honorable Edward M. Neafsey, J.S.C., severed Count I and Count II from

Indictment No. 07-03-0671 and Count III from Indictment No. 07-11-2606, and joined the two remaining counts from each Indictment (two counts of aggravated assault and two counts of witness tampering) for trial.  (ECF No. 8-3, 10-15-08 Pretrial Tr. at 6:6-11.)

Petitioner was then tried before a jury and Judge Neafsey in October 2008, and the jury returned a verdict of guilty on two counts of the lesser-included offense of simple assault, on second degree witness tampering, and on third degree witness tampering.  (See Def. Br. on Direct Appeal at 2.)  On November 12, 2008, Judge Neafsey sentenced Petitioner to an aggregate prison term of 10 years with three and one-third years parole ineligibility.  The sentence ran consecutive to Petitioner's prior violation of probation on Indictment No. 05-04-804.  (ECF No. 8-10, 11-12-08 Sentencing Tr. at 35:2-36:23.)

Petitioner directly appealed from his conviction and sentence to the New Jersey Appellate Division, which affirmed in October 2010 ("October 2010 Opinion").  State v. Bankowski, No. A-3964-08T4, 2010 WL 4054117 (N.J. App. Div. Oct. 13, 2010).  The New Jersey Supreme Court denied certification on March 31, 2011.  State v. Bankowski, 205 N.J. 318 (2011).

Petitioner then filed a habeas petition pursuant to Section 2254 on June 20, 2011.  (ECF No. 1.)  The Respondents filed a response with a copy of the relevant state court record on August 15, 2011.  (ECF No. 8.)  On March 16, 2012, this Court dismissed the petition without prejudice because it was a "mixed" petition containing both exhausted and unexhausted claims.  (ECF Nos. 10, 11.)  Petitioner then moved to reopen the case to

2

proceed with only the exhausted claims.  (ECF No. 12.)  This Court granted the motion,

and the case was reopened on November 13, 2012; the Court directed Respondents to file

an amended answer.  (ECF No. 13.)  The Respondents filed an amended answer.  (ECF

No. 15.)  Petitioner filed a reply in support of the petition.  (ECF No. 17.)

### B.     Statement of Facts

This Court, affording the state court's factual determinations the appropriate

deference, see 28 U.S.C. § 2254(e)(1), will reproduce the recitation as set forth in the

New Jersey Appellate Division's October 2010 Opinion:

> Defendant and his wife first met one another at a bar in Keansburg in July
> 2006.  In December 2006, they were married in a civil ceremony.  The couple
> then resided with defendant's mother at her home in Keansburg.  On
> December 17, 2006, defendant had an encounter with the Keansburg police,
> which resulted in his indictment on one charge of third-degree resisting arrest
> and one charge of fourth-degree obstruction of the administration of law.
>
> A month into their marriage, on January 13, 2007, the couple got into an
> argument at their home over defendant's accusations of the wife's infidelity.
> The wife left and walked to a nearby bar.  Defendant followed her and
> continued to yell at her.  Once at the bar, the wife ordered a pitcher of beer and
> some hard liquor, which she shared with defendant.
>
> According to a female bartender who was on duty at that time, the couple
> continued to argue while at the bar.  Defendant appeared to be doing most of
> the talking.  As the bartender recounted, the wife pushed defendant away when
> "he got in her face," and she "kept putting her head down" and crying.  The
> wife repeatedly told defendant to stop yelling at her, and to leave her alone.
> The arguing persisted and the bartender told the couple that they had to leave.
>
> The wife testified that defendant told her that she should "go have oral sex"
> with a certain male friend of the family.  The wife testified that this remark
> upset her, as the male friend had been "a father figure" to her "for quite some
> time[.]"  In response, the wife "slapped [defendant] across the face for saying
> that."

Defendant then grabbed his wife and slammed her head into the bar.  Defendant claimed that he "tried to help her after [he] did it," that he "didn't realize that it was that hard," and he immediately tried to stop her bleeding.  The wife testified that defendant "wanted to-to see the damage that he did, you know, and he was like, just tell them you slipped, tell them you slipped[.]"  The entire incident, including the physical confrontation, was captured on the bar's surveillance video.

The bartender testified that her attention was drawn to the couple again by the "bang" she heard when the wife's head struck the bar.  She testified that defendant asked her if she had seen his wife "fall."  The bartender replied to defendant that "she didn't fall" and told him "to get away from [the wife]."  At that point, another patron attempted to attend to the wife, but defendant told the patron to leave her alone.  The bartender told her boss to call 9-1-1, and then assisted the wife to the restroom, where she iced her wound and waited for the police to arrive.

Shortly thereafter, Keansburg police arrested defendant at the bar.  The wife was taken first to the police station to have her injuries photographed and her statement taken, and then to a local hospital for treatment.  The wife received eleven stitches in her forehead.  However, despite the attending physician's request, she declined the magnetic resonance imaging needed to diagnose a concussion.  She testified that she "didn't want to go through with it," because she was "humiliated," "scared," and "frightened."  Instead, she left the hospital, returned to the bar for another beer, bought a six-pack, and then walked to the house of the aforementioned friends of her family.

A few days later, on January 16, 2007, defendant wrote to his wife from the county jail; he asked that she "[p]lease visit and write for now and call [the] Prosecutor's Office and see what you can do.  I said you fell and that's that."

As a result of the events at the bar, a restraining order was entered temporarily forbidding defendant from having contact with his wife.  In the meantime, she resided at her friends' home.  The wife eventually decided to resume living with defendant and, at her request, the restraining order was dissolved.

A few days later, after he had been released from jail, defendant presented the wife with a letter that he had prepared and typed himself.  He requested that she sign the letter and send it to the Prosecutor's Office, "[s]o [that] he

wouldn't go to jail."  The letter, which the wife read aloud to the jury during her direct examination at trial, contained one paragraph.  As quoted to the jury, the letter stated, in pertinent part:

> To Whom it May be Concerned ... I do not wish to testify nor make any statements concerning the matter against my husband, James Bankowski.
> ....
> No one is threatening me or making me say this.  I spoke to your office on this matter, my statement stands true.  Thank you very much at this time-thank you for your time.

At defendant's request, the wife eventually signed this letter and evidently went with him to the post office to dispatch it by certified mail.

However, the wife then called the person at the prosecutor's office to whom the letter was addressed and told her "that they were being certified and sent out and that [she] was forced to sign these letters, to be aware that they were coming."  Shortly thereafter, the wife allowed defendant to remove the stitches from her head because, as the wife testified, he "didn't want it to be documented that-that the doctors would write down why I had to have stitches taken out of my head."

About a month later, on February 27, 2007, the wife was scheduled to testify before the grand jury in relation to the January 13, 2007 incident.  She had made prior arrangements with the prosecutor's office to be picked up at her friends' house and driven to the grand jury.  When the wife did not show up at the agreed-upon time, Keansburg police were called to the scene to check on her welfare.

Officer Joseph Jankowski was dispatched to the house following reports that the prosecutor's office "had called and talked to her, she sounded upset and was crying, and they overheard a male in the background."  Officer Jankowski testified that the prosecutor's office had reported that "[a]t that point, the call was terminated and they called several other times to try to get a hold of her with no success."

When he got to the house, Officer Jankowski "knocked on the door, several times [and] rang the doorbell, for several minutes."  After no one responded, Officer Jankowski informed his sergeant, who arrived with two other patrolmen.  All four police officers then went to defendant's residence to "see

5

if the subjects were there." When they arrived at defendant's residence, defendant's mother informed them that neither spouse was present and that they were staying at the residence of the family friends.

The police officers returned to the family friends' house. They rang the doorbell numerous times, and knocked on the door repeatedly. After another ten minutes without any answer, they entered the home forcibly, using a battering ram to force open the front door. The police thereby entered the home and found both the wife and defendant on the premises.

According to the wife, defendant had learned of her upcoming testimony before the grand jury "just prior" to her leaving their residence to meet the employee from the prosecutor's office at her friends' home. She claimed that defendant followed her to the friends' home and told her "don't go, don't go, you don't have to go. They're just trying to do this to coerce you[.]" She testified that, when the prosecutor's employee called, defendant told her not to pick up the phone. When she did answer, she told the employee that she had a doctor's appointment to go to that day. She also testified that, when a police officer began banging on the door, defendant instructed her to get in the bathroom.

In his own testimony at trial, defendant contended that he and the wife were at the friends' house preparing her for an unrelated medical appointment. He claimed that he was waiting for the wife to finish showering, when the police burst into the house and compelled her to go with them. Defendant testified that he demanded to see a warrant or a subpoena, but the police said that they did not have to show him anything and that he would be arrested if he did not remain quiet.

Despite defendant's efforts, the wife did testify before the grand jury on February 27, 2007. Thereafter, on March 14, 2007, the grand jury returned Indictment No. 07-03-0671 against defendant, charging him with one count of third-degree resisting arrest and one count of fourth-degree obstruction of justice, in relation to a December 17, 2006 incident. In that same indictment, the grand jury also charged defendant with third-degree aggravated assault and third-degree tampering with a witness, in relation to the January 13, 2007 incident. Defendant pled not guilty to all of the charges.

The trial date for Indictment No. 07-03-0671 was initially set for August 6, 2007. In anticipation of the trial, the prosecutor sent a trial subpoena to the wife at her friends' house. The wife's seventeen-year-old daughter by another

marriage received the subpoena on July 13, 2007.  The daughter called her mother and read the subpoena to her over the phone.  The daughter testified that, during the phone call, she could hear defendant in the background, telling her mother "don't worry, don't worry about it, you're not going."

According to the wife's testimony, defendant became "panicky" when she told him about the trial subpoena, and he told her that she shouldn't testify against him.  She contended that defendant "wanted [her] to lie and [she] wasn't going to lie."  She asserted that defendant got angry and the argument then got physical, and defendant "gave [her] black and blue [marks] on [her] face[.]"  On cross-examination, the wife admitted that the July 13 argument began when defendant accused the wife of cheating on him.

Defendant presented a markedly different narrative of the events of July 13.  He testified that his wife was taking various prescription medications and drinking, and that she began to abuse him verbally.  Eventually, according to defendant, the verbal abuse escalated and his wife "struck at [his] eye, tried to gouge [his] eye out."  Defendant, who testified that he was particularly sensitive to attacks on his one functional eye, claimed that he "smacked" his wife in response to this perceived attack.

According to the wife, she was "not really" allowed to leave her home for the next five days "because the argument just kept escalating," and because defendant "didn't want [her] to go, didn't want anybody to see [her] face."  On July 18, 2007, the wife finally left and went to the friends' home.  When she arrived there, their daughter-in-law took photographs of her injuries, which included two black eyes, a swollen face, and cuts on her mouth and her lip.  After the photos were taken, the wife gave the camera to her daughter to hide "so [that defendant] wouldn't come in the house and steal it ... and destroy the pictures[.]"

On July 31, 2007, the wife reported the July 13, 2007 incident to the Keansburg police.  At trial, the wife testified that she provided a statement to the police after lengthy questioning that day.

According to the wife's police statement, she "had gotten away from [defendant] for a couple of days [prior to the July 13, 2007 incident], because [they] had been arguing[.]"  She further stated that, "when she came back, [defendant] was drinking and [she] had a couple of drinks [herself]."  The wife

told police that she and defendant got into an argument that started when he accused her of being unfaithful to him and eventually turned to whether or not she would attend the upcoming August 2007 court date.

As a result of the wife's statement to the police, defendant was arrested on July 31, 2007.  He has been incarcerated since that date.  While in jail, awaiting trial on the indictment for the January 13, 2007 incident, defendant wrote a series of letters to the wife, urging her to help him get the indictment dismissed.

The first of these letters, dated September 8, 2007, told the wife:

> You need to recant your story on paper in writing, and there is nothing they can do but drop these charges.  You're the only one.  I don't care what you said or what you-you gave them, that is all irrelevant.  You can change your mind.  You were under heaving drinking and your mind was confused.  So listen to me, you know I know this is b[* * * * * *]t and you can't do this to me.

In her trial testimony, the wife characterized the remainder of this letter as defendant's attempt to convince her "to drop the charges, write these letters and drop the charges, and-and do it."

On September 10, 2007, defendant wrote a second letter to the wife from jail, stating that he "will say and do whatever it takes to get out of [jail]."  He reminded the wife that she had the right to "change [her] story," and that if she recanted her statement it would "help [his] defense big time."  He urged her to "plead the Fifth [Amendment] and request a lawyer."  He underscored the wife's legal privilege not to testify against her spouse, then detailed how she should write her letter to the Monmouth County Prosecutor.

A week later, on September 17, 2007, defendant sent the wife a third letter. This letter contained a number of drawings of eyes, which are apparently similar to certain tattoos of the wife.  In this third letter, defendant told his wife:

> You have a lot to say, your voice will carry a lot of weight, and, hon, that-that letter, please write, sign, notarize, or note, but certify, mandatory, you changed your mind, recant your story, don't listen to these people who want to hurt you and me.  I will not say it no more.

On September 25, 2007, defendant sent a fourth letter to his wife from jail, however, this letter, unlike the others, was typewritten.  In it, defendant again

urged his wife to write a letter to the Monmouth County Prosecutor recanting her testimony.  He specifically instructed her to write the following to the prosecutor:

> Dear Sir, I do not wish to testify against my husband, James Bankowski.  I would like to have all these charges dismissed.  My husband and I would like to work out o[u]r marriage and maintain a happy relationship.
>
> ....
>
> [I]n the matter against my husband, I do not want to testify against him at any court matters.  I would ask this court to dismiss these charges.  I have rights to an attorney, you have violated my rights and proceeded with malice and coercion.
>
> ....
>
> I will ask that you please consider treatment for my husband and myself.  Incarceration is not the answer to our marriage.

In further urging her to send such a letter, defendant wrote,

> Baby, you have to write this, I don't care what happens ... they will make us go against each other.  I will not go against you.  You have to say that I wish not to testify against my husband .... this is a must.  The more you wait, the more time will go by.  These people will hold me here for-for years here.  This is no joke.  Your letter is a must.

A month later, on October 25, 2007, defendant sent a fifth letter to his wife, urging her yet again to write to the prosecutor's office stating that she refused to testify and requesting that the charges against defendant be dropped.  In this fifth letter, defendant asked his wife "[a]re you writing any letters to that courthouse or not?  Or am I just-just going to rot in this jail.  Who are you going to help and ... when are you going to get it through your brain [that] these people don't care if you li[v]e or die, I do."

Defendant sent one additional letter to his wife, in September 2007, urging her to tell the prosecutor that she had been "threatened and coerced" into testifying against him earlier and that she had nothing to say.  He suggested that she tell the prosecutor that she would "draw a picture of [her] past that a jury would not want to hear," and that a "fair deal" should be worked out for defendant.

During the course of receiving these various letters from her incarcerated spouse, the wife wrote back to defendant several times.  In portions of those letters, the wife expressed her love and support for him.  For example, in one such letter, sent on September 13, 2007, she told defendant, "I love you, miss you, baby, please come home.  I'm trying, but there's only so much [that] I can do, my hands are tied."  In another undated letter that presumably was sent in September 2007, she informed defendant that "[t]he assistant prosecutor told me that if I don't show up, that means all charges will be dropped.  So that's my plan."

On November 14, 2007, a grand jury returned a second indictment, No. 07-11-2606, against defendant, charging him with one count of second-degree tampering with a witness, one count of third-degree aggravated assault, and one count of fourth-degree weapons possession in reference to the events of July 13, 2007.  Again, defendant pled not guilty to all charges.  With respect to the assault charges, he asserted both mutual combat and self-defense.

<u>Bankowski</u>, 2010 WL 4054117, at *1-6 (footnotes omitted).

## II.    STATEMENT OF CLAIMS

Petitioner raised several claims for relief in the petition, including claims concerning prosecutorial misconduct and faulty jury instructions.  But as the Respondents point out in the Answer, most of these claims were found to be unexhausted, and Petitioner withdrew those unexhausted claims in reopening the case.  Specifically, in its March 16, 2012 Opinion and Order, this Court dismissed the petition without prejudice as a mixed petition containing both exhausted and unexhausted claims.  This Court expressly found that the ground asserting ineffective assistance of counsel was unexhausted, and that certain other grounds, although raised on direct appeal, were unexhausted because Petitioner asserted only violations of state law and did not allege a deprivation of a federal constitutional right.  (<u>See</u> ECF No. 10.)

Following the Court's Order, in seeking to reopen this action, Petitioner stated that he "wish[ed] to withdraw the points of [his] petition specifically dealing with unexhausted points, and pursue only those points for which [he has] exhausted all State remedies." (ECF No. 12, Motion at 1.) Moreover, Petitioner filed a brief in support of his habeas petition citing only the claim of prosecutorial misconduct. Accordingly, the Court will address only the two remaining claims for habeas relief, i.e., prosecutorial misconduct and faulty jury instructions, as the other grounds raised were waived and withdrawn by Petitioner. The Respondents contend that these remaining grounds should be denied for lack of substantive merit. (ECF No. 15, Resp. Am. Answer at 12-17.)

## III.  STANDARD OF REVIEW

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

As to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see Parker v. Matthews, 132 S.Ct. 2148, 2151 (2012).

11

"Clearly established Federal law" is determined as of the date of the relevant state court decision and is limited to the record before the state court adjudicating the claim on the merits.  Greene v. Fisher, 132 S.Ct. 38, 44-45 (2011); Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).  A state court decision is contrary to clearly established federal law if the state court (1) contradicts the governing law set forth in Supreme Court cases, or (2) confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Jamison v. Klem, 544 F.3d 266, 274 (3d Cir. 2008).  The state court judgment must contradict clearly established decisions of the Supreme Court, as opposed to law articulated by any federal court, Williams, 529 U.S. at 405, although district and appellate federal court decisions evaluating Supreme Court precedent may amplify such precedent.  Hardcastle v. Horn, 368 F.3d 246, 256 n.3 (3d Cir. 2004).  "[C]ircuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court, [and] therefore cannot form the basis for habeas relief".  Parker, 132 S.Ct. at 2155 (quotations and citation omitted).  The state court is not required to cite or even be aware of governing Supreme Court precedent "so long as neither the reasoning nor the result of [its] decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002); Jamison, 544 F.3d at 274-75.  Few state court decisions will be "contrary to" Supreme Court precedent.

A federal habeas court must often determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent, i.e., the state court (1)

12

identifies the correct governing legal rule from the Supreme Court's cases but

unreasonably applies it to the facts of the particular case, or (2) unreasonably extends a

legal principle from Supreme Court precedent to a new context where it should not apply

or unreasonably refuses to extend that principle to a new context where it should apply.

Williams, 529 U.S. at 407.  A showing of clear error is not sufficient.  Lockyer v.

Andrade, 538 U.S. 63, 75-76 (2003).  Nor is habeas relief available merely because the

state court applied federal law erroneously or incorrectly.  See Harrington v. Richter, 131

S.Ct. 770, 785 (2011) (stating "unreasonable application . . . is different from incorrect

application"); see also Metrish v. Lancaster, 133 S.Ct. 1781, 1786-87 (2013); Thomas v.

Varner, 428 F.3d 491, 497 (3d Cir. 2005); Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir.

2005).  A state court's decision that a claim lacks merit precludes federal habeas relief as

long as fairminded jurists could disagree on the correctness of that decision.  See

Harrington, 131 S.Ct. at 786.  Accordingly, "[a]s a condition for obtaining habeas corpus

from a federal court, a state prisoner must show that the state court's ruling on the claim

being presented in federal court was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded

disagreement."  Id. at 786-87.

Federal courts follow a highly deferential standard when evaluating, and thus give

the benefit of the doubt, to state court decisions.  See Felkner v. Jackson, 131 S.Ct. 1305,

1307 (2011); Pinholster, 131 S.Ct. at 1398; see also Harrington, 131 S.Ct. at 786 (stating

habeas corpus is guard against extreme malfunction in state criminal justice system, not substitute for ordinary error correction through appeal); Renico v. Lett, 559 U.S. 766, 778 n.3 (2010) ("whether the trial judge was right or wrong is not the pertinent question"); Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold"); Lockyer, 538 U.S. at 75 (stating it is not enough that federal habeas court, in independent review of legal question, is left with firm conviction that state court erred). This standard applies even where a state court analyzed and rejected a petitioner's federal claims on the merits, but gave no indication of how it reached the decision. See Grant v. Lockett, 709 F.3d 224, 230 (3d Cir. 2013).

A state court decision is based on an unreasonable determination of the facts only if the state court's factual findings are objectively unreasonable in light of the evidence presented in the state court proceeding. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e); Rice v. Collins, 546 U.S. 333, 339 (2006); see Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed correct). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to

14

the factual premises that, as a matter of reason and logic, must have undergirded it."

Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000).  In determining what implicit

factual findings a state court made in reaching a conclusion, a federal court must infer

that the state court applied federal law correctly.  Id.

Even if a petitioner is entitled to habeas relief, a court will grant the writ only if the

error was not harmless.  Under the harmless error standard, "a court must assess the

prejudicial impact of constitutional error in a state-court criminal trial".  Fry v. Pliler, 551

U.S. 112, 121 (2007).  An error is harmless unless it led to "actual prejudice" in the form

of a substantial and injurious effect or influence in determining a jury's verdict.  Brecht v.

Abrahamson, 507 U.S. 619, 637 (1993).

A pro se pleading is held to less stringent standards than more formal pleadings

drafted by lawyers.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner,

404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must

be construed liberally and with a measure of tolerance.  See Rainey v. Varner, 603 F.3d

189, 198 (3d Cir. 2010); Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998).

## IV.   DISCUSSION

### A.    Failure to Instruct the Jury on Mutual Consent as to Assault Charges

Petitioner reasserts the argument made on direct appeal that, as the evidence at trial

showed the alleged assaults occurred while Petitioner and his wife were fighting each

other, the trial court charged the jury on simple assault and mutual consent.  But Petitioner

contends that the instructions failed to inform the jury that the prosecution was required to

prove the absence of mutual consent beyond a reasonable doubt for a finding that mutual

consent did not exist.  The New Jersey Appellate Division found this claim had no merit.

Bankowski, 2010 WL 4054117, at *15.

A jury instruction generally does not merit federal habeas relief merely because it

is inconsistent with state law.  A faulty jury instruction constitutes a due process violation

if it so infected the entire trial that the resulting conviction violates due process.  See

Middleton v. McNeil, 541 U.S. 433, 437 (2004); Estelle v. McGuire, 502 U.S. 62, 71-72

(1991).  Where a federal habeas petitioner seeks relief based upon the jury instructions

given in a state criminal proceeding:

> [t]he only question for us is whether the ailing instruction by itself so infected
> the entire trial that the resulting conviction violates due process. ... It is well
> established that the instruction may not be judged in artificial isolation, but
> must be considered in the context of the instructions as a whole and the trial
> record.  In addition, in reviewing an ambiguous instruction ..., we inquire
> whether there is a reasonable likelihood that the jury has applied the challenged
> instruction in a way that violates the Constitution.  And we also bear in mind
> our previous admonition that we have defined the category of infractions that
> violate fundamental fairness very narrowly.  Beyond the specific guarantees
> enumerated in the Bill of Rights, the Due Process Clause has limited operation.

Estelle v. McGuire, 502 U.S. at 72-73 (quotations, citations, and footnote omitted).

The Due Process Clause is violated only where "the erroneous instructions have

operated to lift the burden of proof on an essential element of an offense as defined by

state law."  Smith v. Horn, 120 F.3d 400, 416 (1997); see In re Winship, 397 U.S. 358, 364

(1970) (holding due process requires proof beyond reasonable doubt of each fact necessary

to constitute crime with which defendant is charged); Sandstrom v. Montana, 442 U.S.

16

510, 523 (1979) (finding jury instruction suggesting that jury may convict without proving each element of crime beyond reasonable doubt violates constitutional rights).  Similarly, where a jury instruction operates to "remove from the jury's consideration a necessary element of the prosecutor's case", the Sixth Amendment right to trial by jury is implicated.  See, e.g., Gonzalez v. Wolfe, 290 Fed.Appx. 799, 811-12 (6th Cir. 2008).

An actual constitutional error is generally subject to "harmless error" analysis. Smith, 120 F.3d at 416-17.  "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless."  Id. at 418.  In evaluating a challenged instruction:

> A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.  If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

Middleton, 541 U.S. at 437 (quotations and citations omitted).

"Even if there is some ambiguity, inconsistency, or deficiency in the instruction, such an error does not necessarily constitute a due process violation.  Rather, the defendant must show both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009) (quotations and citations omitted).

As is relevant here, "[s]imple assault is a disorderly persons offense unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty disorderly persons offense."  N.J.S.A. 2C:12-1(a).  In instructing the jurors on simple assault, the trial court (1) cited the statutory definition of the offense and, (2) stated that they must answer the question as to whether the simple assault was committed in a fight or scuffle entered into by mutual consent if they found Petitioner guilty of simple assault. (See ECF No. 8-8, 10-22-08 Tr. at 115:12-116:3, 133:9-15, & 137:9-13.)  Petitioner argues that this instruction did not expressly advise the jury that the prosecution had the burden of disproving Petitioner's claim of mutual consent beyond a reasonable doubt.

The Appellate Division observed on direct appeal that the trial court had "repeatedly and emphatically instructed the jury that the State had the burden of proving every element of the charged offenses", and that this burden never shifts to the defendant. Bankowski, 2010 WL 4054117, at *15.  The court further stated:

> Considering the jury charge as a whole, the fact that the trial court did not reiterate the reasonable doubt standard and the State's burden of proof in specific relation to the defense of mutual consent is not error having "the clear capacity to bring about an unjust result."  [State v.] Wakefield, [], 190 N.J. [397,] 473 [(2007)].  The proofs identified by defendant as supportive of his "mutual consent" defense were minimal.  They were vastly overshadowed by the State's competing proof that defendant had deliberately exerted physical force against his wife as part of his overall pattern of intimidation and belligerence.  Even recognizing that the wife herself at times responded to defendant's aggressive behavior in kind, defendant's claim that he only struck her as part of a mutual plan of combat strains credulity.  We are confident that the jury's implicit rejection of that defense argument was

18

unaffected by the absence of yet another reminder in the jury charge as to the State's burden of proof.

Id.

This Court has carefully examined the jury charges as a whole and also concludes that the lack of a specific instruction as to the prosecution's burden of proving the absence of mutual consent beyond a reasonable doubt did not in any way corrupt the trial or violate Petitioner's right to due process. The jurors were repeatedly charged that the prosecution had the burden of proving each and every element of the offenses beyond a reasonable doubt and that this burden never shifted to Petitioner. Consequently, taken as a whole, the instructions adequately conveyed to the jurors the law to be applied and did not constitute reversible error. See Waddington, 555 U.S. at 190-91. Petitioner fails to show that the jury charge as a whole, or the charges concerning simple assault and mutual consent, constituted a fundamental due process defect that would give rise to habeas relief. Nor does Petitioner point to any Supreme Court holding that would be violated by the failure of either the trial court to deliver, or trial counsel to request, "more specific" jury instructions than that provided by the trial court as to simple assault and mutual consent. Petitioner also fails to show that there was a reasonable likelihood that the jury applied the instructions in a way that relieved the prosecution of the burden of proving the requisite elements of the assault charges.

The jury instructions were clear and informative, and did not operate in any way to lift the burden of proof on each element of the assault charges. Thus, this Court agrees

19

with the state court that this claim lacks merit.  The Court concludes that Petitioner has

not shown that the state adjudication of these claims was contrary to, or an unreasonable

application of, Supreme Court precedent.  Accordingly, Petitioner is not entitled to habeas

relief on this ground of the petition.

### B.    Prosecutorial Misconduct

Petitioner raises allegations of prosecutorial misconduct, arguing that he was

deprived of a fair trial due to allegedly excessive and improper comments made by the

prosecutor when being cross-examined and in closing argument.  Specifically, Petitioner

argues that the tone of the cross-examination and summation unfairly conveyed to the jury

that the prosecution did not have the burden to discredit Petitioner's claim of self-defense.

Petitioner also argues that the prosecutor improperly emphasized Petitioner's failure to

call any witnesses to corroborate his claim of self-defense.  These arguments were raised

on direct appeal, and the Appellate Division found no basis for a claim of prosecutorial

misconduct:

> Viewed within the context of this hard-fought trial-which pitted an allegedly-
> victimized wife against her husband-and considering the intensity of the
> disputed issues, we do not perceive that either the prosecutor's cross-
> examination of defendant, or his closing arguments, had the clear capacity to
> deprive defendant of a fair trial.  The prosecutor's questioning and summation
> attempted, within the bounds of reasonable advocacy, to impeach the
> credibility of defendant's testimony and his asserted theories of justification of
> mutual combat and self-defense.  In fact, defendant tellingly admitted on
> cross-examination that his claim of self-defense was "a little lame."
>
> Nor do we detect prejudicial error stemming from the prosecutor's argument to
> the jury that the wife's letters were not relevant to defendant's guilt under the

> witness-tampering statutes, as the court's jury charge made plain that the trial
> testimony (which included passages from the wife's letters) was evidence, and
> that the comments of counsel themselves were not evidence.

Bankowski, 2010 WL 4054117, at *16.

Under United States Supreme Court precedent, where prosecutorial misconduct is alleged and a prosecutor's closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quotations and citation omitted); see Parker, 132 S.Ct. at 2153 (noting "clearly established Federal law" relevant to habeas challenge to prosecutor's closing remarks is set forth in Darden); Rolan v. Coleman, 680 F.3d 311, 321 (3d Cir. 2012). Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001); see Brecht, 507 U.S. at 638 (stating prosecutorial misconduct is examined in "light of the record as a whole" to determine whether conduct had substantial and injurious effect or influence on jury's verdict).

This Court has carefully reviewed the state court transcripts of the prosecutor's summation and cross-examination. Giving due consideration to Petitioner's arguments on prosecutorial misconduct, this Court finds no basis to grant habeas relief. The

21

prosecutor's comments during the cross-examination of Petitioner and in closing argument did not infect the trial with unfairness so as to make the resulting conviction a denial of due process.  See Gooding v. Wynder, 459 Fed.Appx. 83, 85-86 (3d Cir. 2012) (concerning prosecutor's comments at various stages of trial).  As stated by the Appellate Division, the prosecutor's questioning and comments were well within the bounds of reasonable advocacy to impeach the credibility of Petitioner's testimony as to his defense of mutual combat and self-defense, especially in the context of the contentious relationship between Petitioner and his wife.

The prosecutor's comments as to the relevancy of the wife's letters on the witness tampering charges were harmless given the trial court's overall curative instruction to the jury that the trial testimony, which included passages from the wife's letters, was evidence, and that the prosecutor's comments did not constitute evidence.  The Appellate Division properly found that the prosecutor's remarks were not so extreme and were curable.  Thus, the state adjudication of the prosecutorial misconduct claim was not contrary to, or an unreasonable application of, Supreme Court precedent.  Thus, Petitioner is not entitled to habeas relief on this ground of the petition.

## V.    CERTIFICATE OF APPEALABILITY

The Court must determine whether a certificate of appealability should issue.  See 3d Cir. L.App.R. 22.2.  The Court may issue a certificate of appealability only if Petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by Petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability.

## VI.    CONCLUSION

This Court will deny the Section 2254 habeas petition.  A certificate of appealability will not issue.  The Court will enter an appropriate order and judgment.


    s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Dated:  June 23, 2014